IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SANCHIT JAIN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:18-CV-1163 |
| | ) | |
| v. | ) | |
| | ) | |
| CARNEGIE MELLON UNIVERSITY, | ) | *ELECTRONICALLY FILED* |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
CARNEGIE MELLON UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT**

Defendant Carnegie Mellon University ("CMU" or the "University") admitted Plaintiff Sanchit Jain to its highly competitive Master of Computational Data Science Program ("MCDS Program" or the "Program") with full knowledge that he had Attention Deficit Hyperactivity Disorder ("ADHD").

Before he took a single class at CMU, Jain requested and was granted accommodations from CMU, including 100% additional time on examinations and additional notes/taped lectures for his courses. When he began classes, Jain requested additional accommodations in the form of flexible assignment completion deadlines; CMU also granted this request.

Throughout the Fall 2017 semester, Jain frequently took advantage of the flexible assignment completion deadline accommodation – often requesting and receiving repeated extensions on the same assignments.

Despite numerous accommodations, Jain simply could not do the work required of the Program. He dropped one of his courses within the first month of the semester. In each of his remaining courses, Jain requested repeated extensions, and often requested additional extensions on the same assignment or after the deadline had already passed. In providing these

accommodations, CMU's professors provided Jain with more flexibility than required under the accommodation plan approved by CMU's Office of Disability Resources.  Indeed, one of Jain's professors even allowed him to take three additional days to study for his midterm exam, going above and beyond the type of accommodation that is envisioned by the flexible assignment completion deadline accommodation.

Rather than spending the time needed to complete this work, however, Jain spent hours sending lengthy emails to his professors requesting additional extensions and, after receiving extensions, simply did not do the work.  Eventually, Jain elected to drop a second course.  Unable to complete the assignments in his remaining courses – even with extensions – Jain requested incomplete grades.  These requests were denied.

Going into the final examination period, Jain had only three classes left.  Even still, Jain turned in his Seminar Data Systems reports late.  He failed his final in Distributed Systems.  Only 27 minutes before the Computer Networks exam was scheduled to begin, Jain requested a makeup exam, explaining that he would fail the exam if he took it that day while also admitting that he was capable of coming to campus.  His request was denied and Jain elected not to take the exam and failed the course.  He received a B- in his third remaining class.

At the end of the semester, CMU's MCDS Program was in the unenviable position of acknowledging that a student whom they had admitted and with whom they had worked tirelessly to help succeed in his studies – was unable to perform the work required of CMU's highly regarded program.  As a result, the MCDS Program dismissed Jain.

Unable to accept the ramifications of his own actions – including his failure to accept the counsel of his academic advisor and his consistent procrastination – Jain claimed that he was discriminated against on the basis of his ADHD.  His claims were thoroughly investigated by CMU

and his dismissal from the MCDS Program was upheld.  Jain then filed an external complaint with the Department of Education's Office of Civil Rights which – like CMU – found no evidence of discrimination.

After extensive discovery, Jain has produced no record evidence suggesting that his dismissal – or any decision made by the University – was the result of discrimination against him because of his ADHD diagnosis in violation of the Americans with Disabilities Act ("ADA") or the Rehabilitation Act ("RA").  Indeed, the record evidence shows that the University repeatedly went above and beyond to try to help him.  As a result, Jain's claims should be dismissed.

## I.   SUMMARY OF FACTS

Pursuant to Local Rule 56.1, CMU contemporaneously files a separate Statement of Undisputed Material Facts ("Facts"), which is incorporated by reference herein.[1]  A brief summary of the facts follows here.

In the Fall of 2016, Jain applied to transfer to CMU's #1 ranked Master of Computation Data Science Program ("MCDS Program").  Facts, ¶¶ 1-3.  In support of his application, Jain submitted an essay, which disclosed that he had been diagnosed with ADHD.  Facts, ¶ 4.  CMU admitted Jain with knowledge of his disability.  Facts, ¶¶ 5-6.

Before matriculating at CMU, Jain requested and received accommodations for his ADHD.  Facts, ¶ 13.  Specifically, on May 19, 2017, Jain was approved for 100% additional time on examinations and additional notes/taped lectures.  Facts, ¶¶ 18-21.  After the semester started, Jain requested and received additional accommodations for his ADHD, including flexible assignment completion deadlines where possible and appropriate.  Facts, ¶¶ 25-26.

---

1   All record evidence cited by CMU is contained in the Appendix in Support of Carnegie Mellon University's Motion for Summary Judgment also filed herewith.

Having received appropriate documentation evidencing Jain's ADHD diagnosis, CMU granted Jain every accommodation that he requested.  Facts, ¶¶ 20-26.

At the start of the Fall 2017 semester, Jain was enrolled in the following courses: Introduction to Machine Learning; Storage Systems; Distributed Systems; Computer Networks; and Seminar Data Systems.   Facts, ¶ 35 36.  Jain dropped Introduction to Machine Learning in the first month of the semester. Facts, ¶ 37.

Throughout the semester, Jain requested numerous extensions across his courses.  Facts, ¶¶ 41-44.  In several instances, CMU's professors provided Jain with flexibility that went beyond that required by his approved accommodations by providing him with additional time to study for midterm exams and granting him extensions on assignments after the deadline had already passed.  Facts, ¶¶ 48-49.  Despite these extensions, Jain did not perform the work needed to complete his assignments.  Facts, ¶ 51.

In the middle of the semester, Professor Majd Sakr became concerned for Jain.  Facts, ¶ 61.  Jain had reported to Professor Sakr that he was experiencing issues with student partners in two of his courses.  Facts, ¶ 63.  Professor Sakr also noted that Jain was having time management issues.  Facts, ¶ 62.  As a result, Professor Sakr began meeting regularly with Jain, and counseled him on time management skills, assignment prioritization, and schedule making.  Facts, ¶¶ 61-68.  He also advised Jain – whom Sakr believed was under a lot of stress – to visit the University's counseling center.  Facts, ¶ 63.  Jain also took advantage of the University's Academic Development office, where his student coach noted concerns with procrastination, that Jain was using his extensions, without which his assignments would all have been late, that Jain reported skipping the reading for his course, that Jain reported that he was regularly missing classes, and that Jain did not have a time management strategy in place.  Facts, ¶ 69.

As the semester progressed, Professor Sakr continued to meet with Jain regularly and asked Jain to provide him with weekly updates on how his courses were going. Facts, ¶ 67. During some weeks, Professor Sakr tried to meet with Jain more than once a week, and responded to Jain's many emails. Facts, ¶ 67. Eventually, Jain elected to drop his Storage Systems course. Facts, ¶ 91. Still, Jain continued to struggle, even with this reduced three course load. Facts, ¶¶ 94-105

On December 11, 2017, Jain – who had been unable to complete a project despite an extension – requested incompletes in two courses: Computer Networks and Distributed Systems. Facts, ¶¶ 110,120. Under University policy, the decision of whether to award an incomplete grade is left to the discretion of individual professors. Facts, ¶ 111. The professors for both courses denied Jain's request for incompletes. Facts, ¶¶ 119, 121. On December 14, 2017, Jain failed his final exam in Distributed Systems. Facts, ¶ 122. On December 17, 2017, a mere 27 minutes before his Computer Networks exam, Jain requested to be excused from the final and instead to take a makeup exam. Facts, ¶¶ 133, 136. The request was denied, and Jain elected not to attend his final exam in Computer Networks. Facts, ¶¶ 137-38. After failing both finals, Jain requested that the MCDS Program allow him to retroactively drop both courses. Facts, ¶ 140. The MCDS Program denied his request. Facts, ¶ 146.

At the end of the semester, Jain's semester QPA was a 0.89. Facts, ¶ 154. His overall QPA was 1.33. Facts, ¶ 156.

As each semester comes to a close, the MCDS Program conducts an academic progress review to "monitor individual student progress towards graduation regarding the fulfillment of curricular requirements, course grades, and academic integrity." Facts, ¶ 159. If the MCDS Program determines during its academic review that "a student's effort [fell] below the acceptable level of academic performance and/or fail[ed] to meet standards or policies established by

Carnegie Mellon University, the student may be dismissed from the program." Facts, ¶ 160. The MCDS Program also provides warnings to students in the following situations: (1) the student's overall QPA is below 3.0; (2) the student's semester QPA is below 3.0; (3) the student received a grade below a B- in a core course; or (4) the student has committed an Academic Integrity Violation. Facts, ¶ 162. Among other circumstances, the MCDS Program may dismiss a student "if a student has received a total of at least three warnings of any type in evaluation letters from the MCDS program." Facts, ¶ 163.

On December 21, 2016, the MCDS Program Committee met to discuss Jain's academic progress. Facts, ¶ 164. During this meeting, Jain received warnings for: (1) his overall QPA falling below 3.0; (2) his semester QPA falling below 3.0; and (3) his failing R grade in Distributed Systems – a core course. Facts, ¶ 166. The MCDS Program Committee also noted that Jain received a failing R grade in Computer Networks – which would be listed as a core course for the following year. Facts, ¶ 167. Jain received three warnings and the MCDS Program dismissed him on January 4, 2018. Facts, ¶ 170.

Jain internally appealed his dismissal within the University. Facts, ¶¶ 172-81. Jain first appealed his dismissal to the Dean of the School of Computer Science. Facts, ¶ 172. The Dean of the School of Computer Science denied his appeal. Facts, ¶ 174. Jain then appealed to the University Provost. Facts, ¶ 176. The University Provost also denied Jain's appeal, upholding the MCDS Program's decision to dismiss Jain. Facts, ¶¶ 178-81.

Jain also filed an external complaint with the U.S. Department of Education. Facts, ¶ 182. The Department of Education conducted a thorough investigation and found no evidence of discrimination. Facts, ¶ 183.

Following Jain's dismissal from CMU, he returned to the University of Wisconsin-Madison, where he continues to struggle academically.  Facts, ¶¶ 184-189.  Since the Fall 2018 semester, Jain has either dropped or taken incompletes on all classes that he has enrolled in at the University of Wisconsin-Madison.  Facts, ¶¶ 188-89.

## II.   ARGUMENT

To state a claim for disability discrimination under the ADA or the RA,[2] Jain must show that:  (1) he was disabled;[3] (2) he was "otherwise qualified" to participate in the MCDS Program; and (3) he was precluded from participating in the MCDS Program or receiving a service or benefit because of his disability.  *Herrera v. Cmty. Coll. of Allegheny Cty.*, No. CV 16-894, 2017 WL 2813616, at *5 (W.D. Pa. June 29, 2017) (citing *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013)).  If Jain is able to satisfy this *prima facie* burden – which he cannot – the burden shifts to CMU to articulate a legitimate, non-discriminatory reason for its decisions.  *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir.1999).  The burden then returns to Jain to "prove by a preponderance of the evidence that the legitimate reasons offered by [CMU] were not its true reasons, but were pretext for discrimination."  *Id.*

Jain cannot establish his *prima facie* burden and, even if he could, Jain's poor performance despite all required and reasonable accommodation is more than ample legitimate, non-discriminatory reason for his dismissal from the MCDS program.

---

2   The standards for determining a violation of the RA are the same as those under the ADA.  *Herrera,* 2017 WL 2813616, at *4 (citing *Chisolm v. McManimon*, 275 F.3d 315, 324 n.9 (3d Cir. 2001)); *see also McDonald v. Pa. Dep't of Pub. Welfare, Polk Ctr.*, 62 F.3d 92, 95 (3d Cir. 1995).  As such, CMU "confines its discussion to the ADA with the understanding that the principles will apply equally to the Rehabilitation Act."  *Herrera*, 2017 WL 2813616, at *4.

3   For the purposes of summary judgment only, CMU does not dispute that Jain is "disabled" within the meaning of the ADA or the RA.

### A. Jain cannot state a *prima facie* case under the ADA because he was not otherwise qualified to participate in the MCDS Program.

"An otherwise qualified individual is a person who can meet all of a program's requirements in spite of a disability, with or without reasonable accommodations." *Millington v. Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 366 (3d Cir. 2008). As an educational institution receiving federal funding, CMU must make reasonable accommodations to otherwise qualified individuals with disabilities, but is not required to make fundamental or substantial modifications to its program or standards. *See Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 413 (1979).

Courts extend judicial deference to educational institutions with respect to their determination of academic standards and whether a change would substantially alter a program. *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 96 n.6 (1978) (recognizing that higher education institutions have "the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation."); *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) ("[w]hen judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."); *Millington*, 261 F. App'x at 367 (recognizing the "deference ordinarily afforded educational institutions for decisions relating to their academic standards"); *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1047-48 (9th Cir. 1998)) ("Thus, while we recognize that the ultimate determination of whether an individual is otherwise qualified must be made by the court, we will extend judicial deference to the evaluation made by the institution itself, absent proof that its standards and its application to them serve no purpose other than to deny an education to a handicapped person."); *Reichert v. Elizabethtown Coll.* No. 10-2248, 2012 WL

1205158, at *13 (E.D. Pa. Apr. 10, 2012) (quoting *Ewing*, 474 U.S. at 225) ("In evaluating whether Reichert was otherwise qualified, the Court must consider the basis for Elizabethtown College's academic decision and 'should show great respect for the faculty's professional judgment.'").

Where students fail to meet the academic standards set by a university, they are not otherwise qualified. *See Herrera*, 2017 WL 2813616, at *5 ("Here, Plaintiff plainly did not meet the academic standards required by the program as he failed to achieve the required score of 75% in PTA 201 and PTA 202. Plaintiff seems to argue that he did not meet these standards due to his disability. **However, the undisputed evidence demonstrates that Plaintiff did not meet the academic requirements of the program *even after* CCAC provided him with all requested accommodations, including extended time to complete exams and a separate testing area . . . .** Furthermore, Defendants have presented substantial evidence that Plaintiff did not fully utilize the remedial resources available to him for reasons unrelated to his identified disability. For example, he ignored recommendations for tutoring, did not attend any summer labs and participated in less than half of the 11 test reviews.") (emphasis added); *See also Horton v. Methodist Univ.*, No. 5:16-cv-945-D, 2019 WL 320572, at *5  (E.D. N.C. Jan. 23, 2019), appeal docketed 19-1174 (4th Cir. Feb. 14, 2019) (finding student was not otherwise qualified as a result, *inter alia*, her failure of three courses and acknowledgment that she did not study enough for at least one of them); *el Kouni v. Tr. of Boston Univ.*, 169 F. Supp. 2d 1, 4 (D. Mass. 2001) (medical student disqualified because of failing grade). Moreover, disability discrimination laws do not require "an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." *Davis*, 442 U.S. at 413.

Jain was indisputably not a qualified individual for participation in the MCDS Program. Jain's overall QPA was below the required 3.0; it was a 1.33. Facts, ¶ 156. Jain's semester QPA

was below the required 3.0; it was a 0.89.  Facts, ¶ 154.  And, Jain received a failing grade in a core course – Distributed Systems.  Facts, ¶ 152.  Furthermore, CMU provided Jain with *each and every accommodation that he requested for his documented disability*.  Facts, ¶ 21, 26.

Under controlling case law and the undisputed material facts, Jain was not "otherwise qualified" within the meaning of the ADA, he fails to sate a *prima facie* case and his claims fail as a matter of law.

### B.    Jain was not precluded from participating in the MCDS Program because of his disability.

Even if Jain could show that he was an otherwise qualified individual with a disability, however, he has adduced no record evidence of discrimination.  Indeed, Jain cannot identify a single comparator who was treated more favorably than him under similar circumstances.  *See Herrera*, 2017 WL 2813616, at *6; *see also Feng v. Univ. of Del.*, No. 16-664, 2018 WL 1462224, at *1 (D. Del. Mar. 23, 2018), appeal docketed 18-1812 (3d Cir. Apr. 16, 2018) ("While Plaintiff's discrimination claim suffers from several infirmities, one primary flaw is that he has not established a *prima facie* case since he, *inter alia*, has failed to show that he was treated differently than similarly situated students who were not members of his protected class. The proper comparator class is non-Chinese students in the program whose GPA fell below the required 2.0. Plaintiff has failed to proffer evidence of any individuals that fell into this class or that they were treated differently than he. As a result, Plaintiff's discrimination claim must fail.").

Jain has absolutely no evidence that a non-disabled student was allowed to continue in the MCDS Program under similar circumstances (i.e. where they had an overall QPA below 3.0, a semester QPA below 3.0, and received a failing grade in a core course).

First, there is no evidence that Jain was treated less favorably than any student in the MCDS Program because of his disability. Jain testified:

> Q:   Again [Professor Nyberg's January 7, 2018 dismissal letter] notes four issues: Overall [Q]PA, semester [Q]PA, failing grades in a core course, and a failing grade in a course that was going to be listed as core, correct?
>
> A:   Yes.
>
> Q:   Are you aware of any students who had these four issues who were not dismissed from the program?
>
> A:   No.
>
> Q:   Are you aware of any students who had even three of these issues who were not dismissed from the program?
>
> A:   No.
>
> Q:   Okay. Are you aware of any students who failed multiples courses who were allowed to stay in the program?
>
> A:   No.

Facts, ¶ 190.

Second, contrary to evidence of discrimination, the record evidence confirms that CMU faculty and staff went above and beyond to assist Jain in succeeding with his academic studies, as discussed above. In addition to providing Jain with each and every accommodation that he requested, CMU professors – including his advisor Dr. Sakr – coached Jain in hopes that he would succeed in the MCDS Program. Jain testified:

> Q:   Did Dr. Sakr give you advice about how you to manage your time?
> A:   Yeah. Like, once he told me to make a calendar and send it to him.
> Q:   Okay. Do you think that he was trying to help you?
> A:   Yeah. I thought so at that point.
> Q:   Okay. Did he give you advice on how to prioritize assignments?
> A:   Yeah, he did.
> . . .
> Q:   Did he offer to work with you on time management issues?
> A:   I mean, he had been telling me to send him my schedule.

Q: So that's an offer to help, isn't it?

A: Yeah.

Q: Okay. So did you take that as sincere? He was trying to help you?

A: Yeah, at that time I did think he was trying to help me.

Q: Okay: And did he offer to meet with you weekly?

A: Yes.

Q: Again, is that another offer to help?

A: Yes.

*Facts* ¶ 62. *See also* Facts, ¶ 64 ("My advice to Sanchit was the exams in these classes are high stakes. The percentages were high. And if he were to spend the time on asking for extensions --- I should give you a little bit more background . . . Sanchit and I would have these discussions regularly as to how long it takes him to write one of these extension emails that he writes. I don't know if you've seen them all, but they are pretty lengthy. And they're very well articulated. And I would ask him, Sanchit, how long do these emails take you to write? And he would tell me hours. And then I would subsequently ask, why don't you take the time to do the work rather than to write them email? And then he would say I don't know.").

In light of the above, Jain can show no causal connection between his dismissal from the University and his ADHD. Indeed, why would CMU admit Jain with full knowledge of his ADHD only to dismiss him four months later for that same reason? Jain's argument in this case simply confounds logic.

To the extent Jain claims that his professors' refusal to grant him incomplete grades was because of his disability, that argument also fails as he has produced no evidence of any non-disabled students who were given incomplete grades under similar circumstances. Facts, ¶ 190.

Should Jain argue that that he was denied the opportunity to take a makeup exam because of his disability, he again misses the mark. Jain made an unreasonable request when he asked to

skip the final examination for Computer Networks and take a makeup exam a mere 27 minutes before the final began. He has no evidence that any non-disabled students was ever allowed to take a makeup exam under similar circumstances. Facts, ¶ 190.

At base, all Jain has offered is his own random speculation that his ADHD led to his dismissal from the University. This speculation is not enough to satisfy Jain's *prima facie* burden. *See Herrera*, 2017 WL 2813616, at *6 ("Because Plaintiff has not provided the Court with anything more than mere conjecture, the Court is unable to draw the inference that Plaintiff was treated unfavorably on the basis of his disability.").

Importantly, Jain takes no individual responsibility for his performance at CMU, instead preferring to blame others. Jain testified:

> Q: Now, again, the factors set forth in this letter are all accurate about your [Q]PA, overall [Q]PA, semester [Q]PA, and failing multiple classes. Those are all accurate?
> A: Yeah. It was, like, my failure was engineered, so that's correct.
> Q: When you say your failure was engineered, do you take any individual responsibility for your failure?
> A: No.

Facts, ¶ 158.[4]

---

[4] Jain's inability to accept the consequences of his own actions and his inability to accept personal responsibility for his failure to meet the academic standards set by the MCDS Program have caused Jain to lash out in efforts to find someone else to blame. Jain has contacted the Department of Education, the Office of Disability Resources, the Department of Justice, *The New York Times*, *The Washington Post*, multiple law firms, the ACLU, and even the White House. *Jain Dep. 38:21-41:5* (discussing the complaint he failed with the Department of Justice regarding the Department of Education's investigation of his complaint); *109:21-112:17*.

Despite all of Jain's protestations to the contrary, however, Jain has elicited absolutely no record evidence that his ADHD diagnoses was the cause of his dismissal from the MCDS Program, rather than his inability to satisfy the Program's academic standards.

Because Jain cannot state a *prima facie* case, his claims must be dismissed.

### C. Jain's poor performance is a legitimate, non-discriminatory reason for his dismissal from CMU's MCDS Program.

Even if Jain were able to satisfy his *prima facie* burden – which he cannot – Jain's claim still must be dismissed as CMU has more than met its burden of articulating a legitimate, non-discriminatory reason for Jain's dismissal from the University. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). CMU "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* Rather, CMU carries only a "relatively light" burden to produce evidence that, if taken as true, would permit a finding that the challenged action was taken for legitimate, non-discriminatory reasons. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509 (1993)).

As previously discussed, Jain dropped two of his five courses. He received failing "R" grades in two courses – Distributed Systems and Computer Networks and received a B- in his only remaining course Seminar Data Systems. Facts, ¶¶ 94, 152-53. As a result, Jain was dismissed from the MCDS Program. Facts, ¶¶ 157, 170.

Jain's poor performance and his failure to meet the academic standards set by the MCDS Program are the reason Jain was dismissed from the University. *Horton*, 2019 WL 320572, at *14 ("Methodist had a legitimate reason for dismissing Horton: poor academic performance. Horton struggled in her courses even when she received academic accommodations, and Horton failed three courses."). These reasons are wholly unrelated to Jain's ADHD. In light of the foregoing, CMU has satisfied its burden of articulating a legitimate non-discriminatory reason for Jain's dismissal.

**D.     Jain has produced no evidence of pretext of disability discrimination.**

Jain bears the burden of persuading the Court that CMU's proffered reasons are mere pretext for disability discrimination. *Fuentes*, 32 F.3d at 763. To do so, Jain "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [University's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the [University] did not act for the asserted non-discriminatory reasons." *Id*. at 765 (internal quotations and citations omitted). The record is completely devoid of any evidence to support any argument of pre-text beyond his own self-serving speculation.

Tellingly, Jain admits that the reasons cited in his dismissal letter were true. Facts, ¶ 158. He did have a semester QPA that was below 3.0. Facts, ¶ 154. He did have an overall QPA that was below 3.0. Facts, ¶ 156. He did fail a core course. Facts, ¶ 158. Faced with his own failure to meet the MCDS Program's requirements, however, Jain takes no individual responsibility because his failure was "engineered." Facts, ¶ 158. As set forth above, however, Jain has submitted absolutely no record evidence to support his speculation. This speculation "is simply not evidence of discrimination" and cannot allow Jain to avoid summary judgment. *Rouse v. II-VI Inc.*, Civ. No., 2:06-566, 2008 WL 2914796, at *18 (W.D. Pa. July 24, 2008), *aff'd,* No. 08-3922, 2009 WL 1337144 (3d Cir. May 14, 2009) (citing opinions of "[n]umerous courts [that] have opined that a plaintiff's subjective perception of discrimination, standing alone, cannot defeat a defendant's motion for summary judgment.").

As a result, Jain's disability discrimination claim fails as a matter of law.

### III.     CONCLUSION

CMU admitted Jain with full knowledge of his ADHD and granted him every reasonable accommodation he ever requested.  Despite that, Jain did not satisfy the Program requirements and was dismissed.  He has adduced absolutely no evidence to suggest that his dismissal was linked to his ADHD and no evidence of non-disabled comparators who were treated favorably; indeed, the evidence confirms that his failure to meet Program requirements – despite extensive accommodations – led to his dismissal.

For the reasons set forth above, CMU respectfully requests that its Motion for Summary Judgment be granted in its entirety.

Dated:  June 28, 2019

Respectfully Submitted,

REED SMITH LLP

/s/  Mariah H. McGrogan
Catherine S. Ryan (Pa. ID 78603)
Mariah H. McGrogan (Pa. ID 318488)
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, Pennsylvania  15222
T:  (412) 288-4226/3152
F:  (412) 288-3063
E:  cryan@reedsmith.com
      mmcgrogan@reedsmith.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 28, 2019 the foregoing *Memorandum of Law in support of Carnegie Mellon University's Motion for Summary Judgment* was filed electronically with the Court. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system, and the parties may access this filing through the Court's system.

*/s/ Mariah H. McGrogan*
*Attorney for Defendant*