IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Sanchit Jain, | ) | Civil Action |
| | ) | |
| **Plaintiff,** | ) | No. 2:18-cv-01163-PLD |
| | ) | |
| v. | ) | |
| | ) | |
| Carnegie Mellon University | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Plaintiff, Sanchit Jain ("Plaintiff), by and through his attorneys, Kristen C. Weidus, Esq. and Ruder Law, LLC, hereby submits this Brief in Opposition to Defendant's Motion for Summary Judgment.

**INTRODUCTION AND FACTUAL BACKGROUND**

Plaintiff Sanchit Jain is a former Carnegie Mellon Master of Computational Data Science student. (Docket Entry #1, ¶1). Plaintiff brings this action alleging that Defendant Carnegie Mellon University ("CMU") discriminated against him on the basis of his disability in violation of Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990. (Docket Entry #1, ¶1). Specifically, Plaintiff alleges that Defendant discriminated against him by (1) denying Plaintiff's request for an incomplete because he had previously availed himself of his approved disability accommodations; (2) denying Plaintiff an opportunity to take a make-up final exam, despite his satisfaction of Defendant's explicit requirements permitting such a request; (3) denying Plaintiff the opportunity to retroactively drop courses, despite Plaintiff's satisfaction of

Defendant's explicit requirement permitting such a request; and (4) discouraging Plaintiff from utilizing his approved disability accommodations. (Docket Entry #1).

Plaintiff enrolled in Defendant's Master of Computational Data Science program in the Fall of 2017. (Pl. Facts, ¶ 191). Plaintiff had previously completed a year at the University of Wisconsin's Master of Science in Computer Science program, where he had earned a GPA of 4.0. (Pl. Facts, ¶ 192).

Prior to his enrollment in Defendant's program, Plaintiff was diagnosed with Adult Attention Deficit Hyperactive Disorder (inattentive type) in December 2016. (Pl. Facts, ¶ 193). While at the University of Wisconsin, Plaintiff also began experiencing a sleep disorder. (Pl. Facts, ¶ 194). Beginning in May 2017, Plaintiff's sleep disorder forced him to sleep excessively, and also made it extremely difficult for him to wake from sleep. (Pl. Facts, ¶ 195). This was ultimately diagnosed in March 2018 as chronic hypersomnia. (Pl. Facts, ¶ 196). Because Plaintiff was unaware that this chronic health condition could be considered a disability, he did not report it to Defendant's Disability Resources Service Office. (Pl. Facts, ¶ 197).

Plaintiff enrolled in the following courses for the Fall 2017 semester at CMU: (a) Distributed Systems (15-640); Computer Networks (15-641); Storage Systems (15-746); and Systems Seminar (15-64A). (Pl. Facts, ¶ 199). He eventually dropped Storage Systems to give himself more time to focus on his other courses. (Def. Facts, ¶ 91).

After Plaintiff enrolled at CMU, he spoke with Defendant's Disability Resources and Services Office to request reasonable accommodations for his ADHD. (Def. Facts, ¶ 19). Upon presentation of the appropriate medical documentation, he was granted certain disability accommodations. (Def. Facts, ¶ 21). A Summary of Accommodations Memorandum was issued. (Def. Facts, ¶ 24). A revised Memorandum was issued on September 27, 2017 summarizing

Plaintiff's accommodations. (Def. Facts, ¶ 31). The Memorandum provided that Plaintiff would receive the following accommodations: (a) one hundred percent additional time on examinations; (b) additional notes/taped lectures (student must request notes from other students); and (c) flexible assignment completion dates where possible and appropriate. (Pl. Facts, ¶ 200).

Plaintiff was also given a Flexible Assignment Completion Student-Faculty Agreement, which was to be completed with each professor from whom he wished to receive his accommodations. (Pl. Facts, ¶ 202). Plaintiff provided this Accommodation Memorandum, as well as the Flexible Assignment Completion Faculty Student Agreement Form, to his professors in Distributed Systems and Computer Networks. (Pl. Facts, ¶ 202).

Plaintiff met personally with Professor Srinivasa Seshan, his instructor for the Distributed Systems course. (Pl. Facts, ¶ 204). Professor Seshan informed Plaintiff that homework solutions were posted immediately following submission deadlines, and thus he refused to provide Plaintiff with the flexible assignment deadlines specified in his Accommodation Memorandum. (Pl. Facts, ¶ 204). Professor Seshan also indicated it would not be possible to grant extensions on group projects, and that because solo projects were followed almost immediately by a group project, it would not be possible to grant extensions on the solo projects, either. (Pl. Facts, ¶ 206).

In October 2017, Plaintiff was completing a project with a partner in his Distributed Systems course. (Pl. Facts, ¶ 207). Both Plaintiff and his partner experienced health issues, and upon presentation of medical documentation, Professor Seshan granted the pair an extension, as well as additional time to study for the mid-term examination. (Pl. Facts, ¶ 208). Despite previously stating that the same was not available for Plaintiff as a reasonable accommodation, Professor Seshan was willing to offer this when medical issues occurred. (Pl. Facts, ¶ 208).

In December 2017, Plaintiff requested an extension for a solo project in this same course. (Pl. Facts, ¶ 208). Plaintiff was provided a one day extension, but remained unable to complete the project as a result of his increasing anxiety and hypersomnia symptoms. (Pl. Facts, ¶ 208). Professor Seshan refused to grant an additional extension, which prevented Plaintiff from receiving any credit for the project. (Pl. Facts, ¶ 209).

Because Plaintiff was not able to submit the project, he would be unable to pass the course. As a result, he requested an incomplete on December 11, 2017. (Pl. Facts, ¶ 211). Unlike disability-based accommodations, requests for incompletes are governed by a separate CMU policy. (Pl. Facts, ¶ 212). Specifically, if an instructor agrees "when a student, for reasons beyond his or her control, has been unable to complete the work of a course, but the work completed to date is of passing quality and the grade of incomplete provided no undue advantage to that student over other students," a request for an incomplete can be granted. (Pl. Facts, ¶ 212).

Plaintiff attempted to provide Professor Seshan with medical documentation verifying the "circumstances beyond his control" which necessitated the request for an incomplete. (Pl. Facts, ¶ 215). However, Professor Seshan responded that, "unfortunately, without an explicit medical letter/request from CMU disability, we will not be able to give you an incomplete." (Pl. Facts, ¶ 216).

In an effort to appease Professor Seshan, Plaintiff reached out to the Office of Disability Resources in an attempt to obtain the requested documents. (Pl. Facts, ¶ 218). In response, Plaintiff was told that the Office was unable to recommend an incomplete, as this was a purely academic decision to be made at the discretion of each individual course instructor. (Pl. Facts, ¶ 218). When Plaintiff brought this to Professor Seshan's attention, he was told he would not be receiving an incomplete because he had already been provided with too many extensions. (Pl. Facts, ¶ 219).

Plaintiff also requested an incomplete from his Computer Networking instructor. (Pl. Facts, ¶ 221). Again, his request was denied. (Pl. Facts, ¶ 222). No additional reason was provided, and although Plaintiff's instructor would later state no medical documentation was provided to substantiate Plaintiff's request, none was ever requested. (Pl. Facts, ¶ 223).

Plaintiff learned his requests for incompletes were denied shortly before his Computer Networking final exam. (Pl. Facts, ¶ 224). In response, he experienced significant anxiety and was unable to complete the exam. (Pl. Facts, ¶ 224).

Plaintiff knew his increasing anxiety would also impact his ability to take his Distributed Systems final exam, so he requested to be permitted to take a make-up examination rather than taking it on the scheduled day. (Pl. Facts, ¶ 226). CMU policy provides that in exceptional circumstances, a student may encounter an emergency that interferes with his or her ability to participate in a final examination. (Pl. Facts, ¶ 225). In such instances, the policy provides that the student should contact the instructor as soon as possible to request a make-up exam. (Pl. Facts, ¶ 225). Plaintiff did so, explicitly requesting he be permitted to take the final on an alternative date due to his health condition. (Pl. Facts, ¶ 226). Plaintiff's instructor denied this request. (Pl. Facts, ¶ 226).

Because Plaintiff was denied incompletes and the opportunity to take a make-up examination, his grades were negatively impacted, and he requested permission from his advisor, Professor Sakr, to retroactively drop the Distributive Systems Course. (Pl. Facts, ¶ 227). Another CMU policy entitled, "Retroactive Add/Drop Petition, Prior Semester," states that by submitting a petition, a student can "request permission to add/drop a course after the last day of classes." (Pl. Facts, ¶ 228). The policy further explains that graduate students must have the permission of their

department. (Pl. Facts, ¶ 228). Professor Sakr ultimately denied Plaintiff's request, instead encouraging him to take a leave of absence. (Pl. Facts, ¶ 230).

On December 18, 2017, Plaintiff was dismissed from the Master of Computational Data Science program at CMU on the grounds that he had failed two of his courses, one being a core course. (Def. Facts, ¶ 170). On January 11, 2018, Plaintiff submitted an appeal of the dismissal to the Dean of the School of Computer Science, pursuant to Defendant's policy. (Def. Facts, ¶ 172). On January 28, 2018, the Dean upheld Plaintiff's dismissal. (Def. Facts, ¶ 174).

In response, Plaintiff appealed that decision to the Provost of the University on February 11, 2018. (Def. Facts, ¶ 176). The Provost's Office upheld the Dean's decision on March 8, 2018. (Def. Facts, ¶ 178).

## STANDARD OF REVIEW

Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2).

Upon demonstrating to the court that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law, the burden shifts to the non-moving party to persuade the court that there is more than "some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In doing so, the burden rests on the non-moving party to present specific facts that are supported by admissible evidence that contradict those averred by the movant, indicating a genuine issue for trial. Lugan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990).

Upon failing to produce evidence from which a reasonable factfinder could enter a verdict in the non-moving party's favor, the Court must grant summary judgment. Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 65 (3d Cir. 1996).

## ARGUMENT

To prove a claim under either the Americans with Disabilities Act ("ADA") or Rehabilitation Act ("RA"), Plaintiffs must show that: "they are handicapped or disabled as defined under the statutes; (2) they are otherwise qualified to participate in the program at issue; and (3) they were precluded from participating in a program or receiving a service of benefit because of their disability." CG v. Pa. Dep't of Educ., 734 F.3d 229, 235 (3d Cir. 2013) (citing Chambers ex rel. Chambers, 587 F.3d 176, 189 (3d. Cir. 2009). With only limited exceptions, the same legal principles govern ADA and RA claims. Id. at 235.

Once a plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for the plaintiff's adverse treatment." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Finally, should the defendant carry this burden, the plaintiff then must have the opportunity to provide by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

### A. Plaintiff's evidence is sufficient to establish that he is "otherwise qualified" to participate in Defendant's program.

Although Plaintiff contends the evidence overwhelmingly supports that he is "otherwise qualified" to participate in Defendant's program, Plaintiff acknowledges that his burden is much lower than that at this time. Pursuant to the standard of review at the summary judgment stage, this

Court is only tasked with determining, after viewing all the evidence in the light most favorable to Plaintiff, whether there exists a genuine and material factual issue regarding his qualifications for Defendant's educational program. Plaintiff has more than met this burden.

"A two-part test is used to determine whether someone is 'a qualified individual with a disability.'" Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998) (citing 29 C.F.R. pt. 1630, App. at 353-54.) The two-part test is as follows: (1) A court must consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.; and (2) A court must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation. Id. (internal citations omitted). This determination is made at the time of the employment decision. Id.

Specifically, in the context of postsecondary education, Section 504 of the Rehabilitation Act defines a qualified person with a disability as one "who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity." 34 C.F.R. § 104.3(k)(3). Similarly, the ADA defines a qualified individual with a disability as someone who "with or without reasonable modifications or barrier removals meets the essential eligibility requirements of the program." 42 U.S.C.A. § 12131(2). Public accommodations (including private universities) must make reasonable modifications in policies, practices, and procedures unless this would fundamentally alter the program and must remove barriers where it is readily achievable to do so. 42 U.S.C.A. § 12182(b)(2)(A).

As cited by Defendant, the Court in Davis determined that an educational institution is not required to make fundamental or substantial modifications to its program or standards. Se. Cmty.

Coll. v. Davis, 442 U.S. 397, 413 (1979). However, several years later, the Supreme Court elaborated, adding that:

> The balance struck in Davis requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.

Alexander v. Choate, 469 U.S. 287, 301 (1985).

In support of its argument, Defendant relies heavily on multiple unpublished opinions that are non-precedential. Moreover, these cases are easily distinguishable from Plaintiff's case. In Millington, Plaintiff struggled academically for more than two years, beginning at the inception of her studies and prior to suffering from any disability that would have entitled her to disability accommodations. Millington v. Temple Univ. Sch. of Dentistry, 261 F. App'x 363, 366 (3d Cir. 2008)(unpublished). It was clear from the record, and undisputed, that prior to the onset of her disability, Plaintiff was not qualified to participate in her educational program. Id. In Herrera, another case relied upon heavily by Defendant, the Plaintiff did not fully utilize the resources available to him. Herrera v. Cmty. Coll. of Allegheny Cty., 2017 WL 2813616 (W.D. Pa. 2017). Plaintiff's case is easily distinguishable from both Millington and Herrera.

In the instant matter, Plaintiff was admitted to the MCDS Program at Carnegie Mellon University, thereby demonstrating that at the time of admission, Plaintiff met the essential eligibility requirements of the program and satisfied the rigorous admission standards set forth by Defendant. Plaintiff further demonstrated he was an "otherwise qualified" individual as evidenced by his passing grades on his midterm exams, his success in a summer course, and his ability to receive a passing grade in the one course that he was able to complete during the Fall 2017

semester. (Ex. A, p. 44). These facts alone, taken in a light most favorable to Plaintiff, demonstrate Plaintiff's ability to meet the program's requirements in spite of his disability.

Only once Defendant engaged in discriminatory behavior did Plaintiff struggle to successfully complete the academic requirements of his program. It would be outrageous to allow Defendant to engage in disability discrimination and then be permitted to use the result of said discrimination to claim Plaintiff was not an otherwise qualified individual.

The record in this matter reflects that at various times Plaintiff was discouraged from utilizing his approved disability accommodations. (Ex. A, p. 37; Def. Facts, ¶ 28). As the Court in Alexander held, an otherwise qualified individual must be provided with meaningful access to the benefit offered by the grantee, and the benefit cannot be defined in a way that otherwise denies the individual meaningful access. Alexander v. Choate, 469 U.S. at 301.

Here, Defendant admits that it discussed "pros and cons" and said a requested accommodation was "a little bit tricky" to implement. (Def. Facts, ¶¶ 27-28). Although Defendant presents its version of the facts in a light most favorable to it, it is clear, and a reasonable jury could conclude, that Defendant's "counseling" about the "pros and cons" of a requested accommodation was nothing more than a loosely veiled attempt to discourage Plaintiff from seeking and utilizing that particular accommodation.

Despite the overt discouragement, Plaintiff secured the accommodation for flexible assignment completion dates. However, this accommodation was not without restriction -- Plaintiff would only be provided this accommodation "where possible and appropriate." This limitation effectively provided Defendant with an open ability to deny Plaintiff the disability accommodations he should have been entitled to, which unsurprisingly occurred. (Def. Facts, ¶¶. 52-57). Additionally, the record and facts provided by Defendant indicate that Professor Sakr

discouraged Plaintiff from asking for extensions; instead lecturing him that he should have spent the time it took to write the email asking for an extension on the work for his courses. (Ex. A, p. 37). Defendant ultimately went even further, using Plaintiff's disability accommodations as rationale for denying him the benefits of policies available to all CMU students, including the granting of incomplete grades or retroactive dropping of classes. Defendant's own facts clearly demonstrate that Plaintiff was not provided with meaningful access to the benefits offered by Defendant's program required under the law, and thus support a genuine issue of material fact that makes a granting of Defendant's Motion for Summary Judgement inappropriate.

Prior to Defendant's discriminatory conduct, Plaintiff was otherwise qualified to participate in Defendant's educational program. In other words, had Defendant provided Plaintiff meaningful access to his approved disability accommodations instead of discouraging their use, Plaintiff would have been able to successfully complete his program. Given the numerous issues of material fact in the instant matter, Defendant's Motion for Summary Judgment must be denied.

**B. Plaintiff was precluded from participating in Defendant's program and denied program benefits as a result of his disability.**

Having thus established that he is "otherwise qualified," Plaintiff must next establish that he was aggrieved by an adverse action of Defendant, and that the adverse action—in this case, Defendant's refusal to permit Plaintiff to utilize policies afforded to CMU students who did not receive disability accommodations, as well as discouraging Plaintiff's use of his approved disability accommodations—occurred under circumstances giving rise to an inference of illegal discrimination. Venter v. Potter, 694 F. Supp. 2d 412, 422 (3d Cir. 2010).

There is no question that Plaintiff was aggrieved by Defendant's efforts to discourage his use of his disability accommodations. Prior to Defendant's interference, Plaintiff was able to

obtain passing grades on his midterm exams and successfully completed a summer course. While Plaintiff's ability to remediate his academic situation cannot be guaranteed, it is certain that being discouraged from utilizing his disability accommodations resulted in Plaintiff's falling behind, an increase in his anxiety, and his ultimate dismissal from Defendant's program.

Further, in response to Plaintiff's attempts to utilize his approved disability accommodations, Defendant denied Plaintiff other benefits which other non-disabled students were entitled to receive, which Plaintiff should have also been able to receive. The record supports Plaintiff's claim that he did not receive these other benefits on the basis of his disability. Specifically, Plaintiff was told by Professor Seshan that he would not receive an incomplete, despite Plaintiff requesting it in accordance with Defendant's policy, because Plaintiff had already been provided with too many extensions. (Pl. Facts, ¶219). These "extensions" referred to by Professor Seshan were approved disability accommodations that should have had no negative impact on Plaintiff's ability to access Defendant's other policies and practices.

Defendant attempts to argue that Plaintiff was provided "each and every" accommodation sought for his disability. However, this argument is disingenuous as it fails to include the difficulty Plaintiff had in accessing his disability accommodations, the frequent discouragement he encountered when trying to utilize these accommodations, and the disparate treatment he received after utilizing his accommodations. Defendant's behavior through Plaintiff's time at CMU only exacerbated the symptoms of Plaintiff's disabilities and chronic health conditions. As a direct result of his receipt and use of disability accommodations, Defendant denied: 1) Plaintiff's request for incomplete grades; 2) Plaintiff's request to take a make-up final exam; and 3) Plaintiff's request to retroactively drop courses. These three requests are all options available to students in

Defendant's program and were pursued appropriately and in accordance with Defendant's policies by Plaintiff.

By being denied the opportunity to request incomplete grades, take a make-up final exam, and retroactively drop courses, Plaintiff was aggrieved. The analysis of a student plaintiff being aggrieved by a college's adverse action was addressed in the case of Sellers v. University of Rio Grande, 838 F. Supp. 2d 677 (2012). In Sellers, the plaintiff alleged a violation of Section 504 and the ADA where the University offered tutoring services to all students, but denied her adequate tutoring in light of her disability. Id. The Court concluded that while there was no affirmative duty for post-secondary educational institutions to provide tutoring services to students with disabilities, there was a "substantial argument to be made that the University was required under 34 C.F.R. 104.4(b)(ii) to provide tutoring to its disabled students to the same extent it offered such services to its general student population. Id. at 86.

Similarly, the Plaintiff here is alleging that the benefit in question—the opportunity to request incomplete grades, take make-up final exams, and retroactively drop courses—was not provided to the extent that such services were provided to his nondisabled peers. Plaintiff was explicitly informed by Professor Seshan that he would not be permitted to receive an incomplete grade in his Distributed Systems course because he had already been granted too many extensions. (Pl. Facts, ¶219). Furthermore, the Master of Computational Data Science Program Student Handbook explicitly provides that an incomplete grade "may be given when a student has been unable to complete the work of a course" so long as the work completed to that date was of passing quality and the grade of incomplete provides no undue advantage to that student over other students. (Pl. Facts, ¶212). As previously explained, granting Plaintiff's request for an incomplete would not have provided him an undue advantage over other students. Moreover,

prior to the discriminatory actions taken by Defendant, Plaintiff was achieving passing grades in his courses. (Ex. A, p. 44). Plaintiff thus alleges that Defendant's refusal to grant his request for an incomplete grade was due to his disability.

Additionally, CMU generally allows students to retroactively drop courses when extenuating circumstances prohibit them from finishing the course work for the class or negatively impacted their performance. (Def Facts ¶ 142). The extenuating circumstances must have been unknown and/or unanticipated during the semester. (Def Facts ¶ 143). Finally, the decision whether to grant a request to retroactively drop a course is within the discretion of a student's department. (Def Facts ¶ 144). In the instant case, despite Plaintiff's efforts to provide documentation to verify the unanticipated increase in the symptoms of hypersomnia and anxiety he was experiencing which impacted his performance, Defendant denied Plaintiff's request. (Pl. Facts, ¶ 230). Plaintiff alleges this denial, too, was due to his disability.

Given these two policies were available to non-disabled students, and Plaintiff was not provided the opportunity to utilize the policies, this denial gives rise to the inference of disability-based discrimination. Defendant argues that because Plaintiff does not point to any explicit examples of students without disabilities being permitted to utilize these policies during the 2017-2018 school year he cannot establish a prima facie case of discrimination, this argument misinterprets the legal standard. Although this is one method of establishing a prima facie case of disability-based discrimination, it is not the sole available option. The Third Circuit has made clear that "the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." Sarullo v. U.S. Postal Service, 352 F.3d 789, 798 (3d Cir. 2003)(citing Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996).

In summary, the above-outlined factors in total establish the necessary discriminatory inference required by McDonnell Douglas, 411 U.S. 792 (1973). As such, Defendant's Motion for Summary Judgment should be denied.

**C. Defendant's stated reasons for denying Plaintiff the benefit of Defendant's program are a pretext, and discriminatory animus was the motivating factor behind Defendant's adverse action.**

Under the McDonnell Douglas framework, once a plaintiff has established a prima facie case, the rebuttable presumption of discrimination arises. 411 U.S. 792, 804 (1973). Thereafter, the burden of production shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. Id.

In the instant case, Defendant alleges that it was Plaintiff's poor academic performance which was ultimately the basis for Plaintiff's dismissal. This, Defendant alleges, is the legitimate and nondiscriminatory reason for refusing to grant Plaintiff's requests for incomplete grades or the ability to retroactively drop courses, as well as Plaintiff's ultimate dismissal from Defendant's program. Moreover, Defendant argues that interactions wherein Plaintiff was discouraged from using his disability accommodations—more specifically, from requesting extensions on assignments or exams—were actually attempts by staff to assist Plaintiff. Requesting extensions, Defendant's staff suggested, would result in procrastination, or misplaced focus on "less significant" assignments.

Plaintiff concedes that a reasonable fact finder could determine that Defendant has met its burden to proffer a legitimate, nondiscriminatory reason for its refusal to grant Plaintiff incomplete grades, its refusal to permit Plaintiff to retroactively drop courses, and its ultimate decision to dismiss Plaintiff from Defendant's program. Further, Plaintiff acknowledges the same could be decided regarding Defendant's alleged rationale in discouraging the use of his

accommodations. Thus, the burden now shifts back to Plaintiff, and he must show that the "legitimate" reasons offered by Defendant were not its true reason, but were instead a pretext for discrimination.

In interpreting this final stage of the burden shifting-analysis in the employment context, the Court in Shaner v. Synthes, 204 F.3d 494 (3d. Cir. 2000) held that:

> "[A] plaintiff may defeat a motion for summary judgment (or judgment as a matter of law) by pointing "to some evidence, direct or circumstantial, from which a factfinder could reasonably either; (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 501 (citing Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994)).

In establishing pretext, it is not enough to show the employer's reasons were mistaken, unwise, imprudent, or incompetent; instead, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Klimek v. U.S. Steelworkers Local 397, 618 Fed. Appx. 77 (3d. Cir. 2015) (unpublished)(citing Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994)).

Plaintiff asserts that the above circumstantial evidence showing the implausibility of Defendant's justification for discouraging Plaintiff from utilizing his disability accommodations, denying him incomplete grades and the ability to retroactively drop courses, and ultimately dismissing him from Defendant's program show discriminatory intent. Moreover, there is substantial direct evidence from which a reasonable factfinder could determine that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Defendant's action. Fuentes v. Perskie, 32 F.3d 759, 767 (3d Cir. 1994).

Most notable is Professor Seshan's explicit refusal to grant Plaintiff's request for an incomplete grade. (Pl. Facts, ¶ 219). First, Professor Seshan indicated that Plaintiff must obtain documentation from the Office of Disability Resources in order for an incomplete grade to be permitted. (Pl. Facts, ¶ 214). This is contrary to Defendant's own policy. When the Office of Disability Resources explicitly informed Professor Seshan that the provision of incomplete grades was not a disability accommodation, this did not deter him. Rather, Professor Seshan informed Plaintiff, "unfortunately, we have given you numerous extensions through the semester for individual assignments. We cannot grant you an incomplete as well." (Pl. Facts, ¶219). In other words, because Plaintiff elected to rely upon the disability accommodation he had been approved to use, Professor Seshan was unwilling to permit Plaintiff to receive the benefit of the incomplete grade policy available to all CMU students. Here, Plaintiff does not need a jury to make a reasonable inference or an assumption; instead, a reasonable fact finder can use Professor Seshan's words as an admission that Plaintiff was denied the right to an incomplete because he was a student with a disability.

Moreover, Plaintiff was discouraged from using his approved disability accommodations on many other occasions. For example, in September 2017 when Plaintiff met with the Director of Disability Resources, Catherine Getchell, she discouraged him from pursuing the additional accommodation related to assignment extensions. (Def. Facts, ¶¶ 27-28). Later in the Fall 2017 semester, Plaintiff's advisor, Professor Sakr, did the same. (Ex. A, p. 37).

As outlined above, there are sufficient factors in this case that would permit a factfinder to disbelieve the Defendant's articulated reasons for denying Plaintiff's requests for incomplete grades, to retake exams, or to retroactively drop courses, as well as its rationale for discouraging Plaintiff's use of his disability accommodations. Taken together, these same factors would also

permit a factfinder to disbelieve Defendant's stated reason for ultimately dismissing Plaintiff from its program. Instead, a factfinder could reasonably conclude the true rationale for Defendant's actions was disability based discrimination. In summary, Plaintiff has provided sufficient evidence, thereby meeting his burden under the relevant standards. As such, Defendant's Motion for Summary Judgment should be denied.

## CONCLUSION

For the good and sound reasons advanced herein, Plaintiff, Sanchit Jain, respectfully requests that this Honorable Court deny Defendant's Motion for Summary Judgment.

Respectfully Submitted,

/s/ *Kristen Weidus*
Kristen C. Weidus, Esq.
Attorney I.D. No. 313486
Ruder Law
429 Forbes Avenue, Suite 450
Pittsburgh, PA 15219
Telephone: (412) 281-4959
Fax: (412) 291-1389
Email: kristenweidus@ruderlaw.com

Date: August 9, 2019