IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SANCHIT JAIN,                           )
                    Plaintiff,          )
                                        )
         vs                             )        Civil Action No. 18-1163
                                        )
                                        )        Magistrate Judge Dodge
CARNEGIE MELLON UNIVERSITY,             )
                    Defendant.          )

## MEMORANDUM OPINION

Plaintiff Sanchit Jain ("Jain") brings this action against Defendant Carnegie Mellon University ("CMU") under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("RA") and Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181-12189 ("ADA"). He alleges that his dismissal from CMU's Master of Computational Data Science Program ("MCDS Program") represented disability discrimination in violation of these statutes.

Jain commenced this action in August 2018 and the parties later consented to jurisdiction by a magistrate judge under 28 U.S.C. § 636(c). After discovery closed, CMU filed the pending motion for summary judgment which has been fully briefed. For the reasons that follow, the motion will be granted.

### I.    Factual Background[1]

In the fall of 2016, while a student at the University of Wisconsin-Madison's ("UW")

---

[1] CMU submitted a Concise Statement of Material Facts (ECF No. 32) in support of its motion. Jain admits almost all of these facts (ECF No. 42). In turn, Jain submitted his own version of the facts (*id.* at 12-19), to which CMU has responded (ECF No. 47). While CMU disputes many of Jain's facts, they are not material to the issues raised in CMU's motion. In this section of the opinion, the Court will set forth those facts that are material to the issues addressed by CMU. In the Discussion section of this opinion, the Court will briefly explain why Jain's additional facts are not material to a resolution of CMU's motion.

Master of Science in Computer Sciences Program, Jain applied to transfer to CMU's MCDS Program. (Defendant's Concise Statement of Material Facts ("DCSMF") ¶¶ 1-2.)[2] As part of his application, Jain submitted an essay which disclosed that he had been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). (*Id.* ¶ 4.) In February 2017, CMU accepted him into the MCDS program with knowledge of his ADHD. (*Id.* ¶¶ 5-6.) Before matriculating at CMU, Jain provided medical documentation of his ADHD and requested accommodations. (*Id.* ¶¶ 13-16.)

CMU's Office of Disability Resources has the responsibility for providing reasonable accommodations and other resources for students with disabilities so that its programs and services are available to them. (DCSMF ¶ 7). Students must self-identify with the Office of Disability Resources and request accommodation. (*Id.* ¶ 9.) Students who require an accommodation must meet with Catherine Getchell ("Getchell"), the Director of the Office of Disability Resources, who assists in determining an appropriate set of accommodations. (*Id.* ¶ 10.) It is the student's responsibility to notify the Office of Disability Resources of any difficulties related to these accommodations. (*Id.* ¶ 12.)

On May 19, 2017, Jain met with Getchell, who granted all the accommodations he requested. (*Id.* ¶¶ 19-21.) Jain was approved for 100% additional time on examinations and additional notes/taped lectures to assist him. (*Id.* ¶¶ 18-21.) During this meeting, Getchell provided him with a Student Individual Accommodation Plan, which is not ordinarily shared with faculty, and a Student Accommodation Memorandum. (*Id.* ¶¶ 22-24.) Jain was responsible for providing his instructors with the Memorandum, which did not identify his disability but only the accommodations that were approved. (*Id.* ¶ 24.)

---

[2] ECF No. 32.

The fall semester commenced on August 27, 2017. (*Id.* ¶ 34.) One month after the semester started, Jain met again with Getchell and requested additional accommodations for his ADHD, including flexible assignment completion deadlines. (*Id.* ¶¶ 25-26, 29-30.) He requested these additional accommodations because of issues he was experiencing with assignment completion. (*Id.* ¶ 25.)

During this meeting, Getchell discussed the "pros and cons" of flexible assignment completion dates. She advised Jain that this accommodation "is a little bit tricky" to implement and has some "potential pitfalls" because it could result in procrastination or cause a student to fall behind on assignments as the semester progressed. (*Id.* ¶¶ 27-28.) Jain believed that procrastination would not be an issue for him, and that the additional accommodation would allow him the flexibility that he might need during periods when he had a heavy workload as it would allow him to spread out his work. (*Id.* ¶ 29.) Getchell agreed to provided him with flexible assignment completion dates where they were possible and appropriate. (*Id.* ¶ 30.)

At the start of the fall 2017 semester, Jain was enrolled in five courses: Introduction to Machine Learning; Storage Systems; Distributed Systems; Computer Networks; and Seminar Data Systems. (*Id.* ¶¶ 35-36.) He dropped Introduction to Machine Learning in the first month of the semester. (*Id.* ¶ 37.) He did not regularly attend Distributed Systems and Computer Networks. (*Id.* ¶¶ 38-40.) Throughout the semester, Jain requested numerous extensions in his courses. (*Id.* ¶¶ 41-44.) In several instances, CMU's professors provided Jain with flexibility that went beyond that required by his approved accommodations by providing him with additional time to study for midterm exams and granting him extensions on assignments after the deadline had already passed. (*Id.* ¶¶ 48-49.) This was done even though CMU does not require professors to

offer retroactive accommodations. (*Id.* ¶ 50.) Despite these extensions, Jain did not perform the work needed to complete his assignments. (*Id.* ¶ 51.)

On one occasion, Jain informed Getchell that Professor Srinivasan Seshan, who taught Distributed Systems, had refused to provide him with "extra time on Homework or assignments." (*Id.* ¶¶ 52, 53.) While flexible assignment completion dates were not always possible, with Jain's permission, Getchell contacted Professor Seshan to see if it could be done. (*Id.* ¶ 54-55.) Professor Seshan told Getchell that he had provided Jain with extensions on several key assignments and was allowing Jain to take the mid-term exam three days late above and beyond the requirements of the accommodation, which did not apply to the timing of exams. (*Id.* ¶¶ 54-57.) Professor Seshan also permitted Jain to take extra time on exams and to record audio lectures for the three or four lectures he attended. (*Id.* ¶60.) Jain acknowledged that he had been provided these extensions and Getchell instructed Jain to let her know if he had any difficulties moving forward. (*Id.* ¶¶ 58,59.)

In the middle of the semester, Professor Majd Sakr, Jain's academic support advisor and co-professor of the Seminar Data Systems course, became concerned about Jain. Jain had reported to Professor Sakr that he was experiencing issues with student partners in two of his courses. (*Id.* ¶¶ 36, 61, 63.) Professor Sakr also noted that Jain was having time management issues. (*Id.* ¶ 62.) As a result, Professor Sakr began meeting regularly with Jain and counseling him on time management skills, assignment prioritization, and schedule making. (*Id.* ¶¶ 61-68.) He also advised Jain, who he believed was under a lot of stress, to visit the University's counseling center. (*Id.* ¶ 63.) Jain advised that his plan for "getting back on track" was to get additional help on time management from CMU's Academic Development office. (*Id.* ¶ 68.) His student coach there noted various concerns about Jain, including procrastination, skipping the

reading for his course, regularly missing classes, the lack of a time management strategy and the fact that all of Jain's assignments would be late if it weren't for extensions. (*Id.* ¶ 69.)

As the semester progressed, Professor Sakr continued to meet with Jain regularly and responding to his numerous emails. He asked Jain to provide him with weekly updates on how his courses were going. (*Id.* ¶ 67.) During the same time frame, the professors in Jain's other courses began to express concern for Jain and his inability to turn in assignments even after they granted him extensions on his due dates. (*Id.* ¶¶ 70-90.)

In late November 2017, Jain elected to drop the Storage Systems course. (*Id.* ¶ 91.) He continued to struggle with a reduced course load of three classes. After he submitted his last assignments for the Seminar Data Systems course, only two active course remained. His last day of classes was December 8, 2017, leaving only the final exams in his two remaining courses. (*Id.* ¶¶ 94-105.)

On December 11, 2017, Jain requested incomplete grades in Computer Networks and Distributed Systems. (*Id.* ¶¶ 110, 120.) See PCSMF ¶ 211. The University policy on incomplete grades states as follows:

> Carnegie Mellon students are expected to complete a course during the academic semester in which the course was taken. However, if the instructor agrees, a grade of I (incomplete) may be given when a student, for reasons beyond his or her control, has been unable to complete the work of a course, but the work completed to date is of passing quality and the grade of incomplete provides no undue advantage to that student over other students.

(DCSMF ¶ 111.)[3] An incomplete is not an accommodation for a disability. (*Id.* ¶ 117.) Professor Seshan, the instructor in Distributed Systems, advised that without a note from the Office of

---

[3] ECF No. 31-6 at 7. The MCDS Student Handbook contains a similar statement but it leaves out the phrase "for reasons beyond his or her control." (ECF No. 31-3 at 17.) As the parties have relied on the CMU policy, rather than the MCDS Student Handbook version, the Court will utilize this policy in its analysis.

Disability Resources, he would be unable to provide Jain with an incomplete. (PCSMF ¶ 214.)[4]

Jain then asked for Getchell's help in obtaining an incomplete. (*Id.* ¶¶ 115-16.) In response, Getchell advised Jain that the Office of Disability Resources was not able to recommend that students take an incomplete as a disability accommodation. (*Id.* ¶117.) She volunteered to advise Professor Seshan of this and to suggest that he meet with Jain to discuss him accommodations for the next semester, and Jain agreed. (*Id.*) She then emailed the professor of the decision not to recommend an incomplete, noting that:

> It is typically an essential component of a course that it be completed within a specified amount of time (e.g. a semester). Granting students with disabilities an extended deadline for overall course completion would place an undue hardship on the faculty member and the university in many cases. So we make a practice of not allowing this specifically as a disability accommodation. We do allow flexible assignment completion dates in some cases, such as [Jain's], but we tell students that all of their assignments are still due by the end of the semester, so that any flexibility given is only within the semester.

(DCSMF ¶ 118.) Professor Seshan then advised Jain that "Based on the response from Disability Resources, we will *NOT* be giving you an incomplete." (ECF No. 33-2 at 354.) When Jain asked him to reconsider, Professor Seshan responded that "Unfortunately, we have given you numerous extensions through the semester for individual assignments. We cannot grant you an incomplete as well." (ECF No. 33-2 at 353.) See PCSMF ¶ 219. Jain failed his final exam in Professor Seshan's class. (DCSMF ¶ 122.)

In Jain's remaining course, Computer Networks, Professor Sherry denied his request for an incomplete but told him that he was "very close to the finish line" and could make it. She also told him what he needed to do to finish the course. (*Id.* ¶¶ 120-21.) Only twenty-seven minutes before Professor Sherry's final exam, Jain requested to be excused from the final and instead to

---

[4] Jain claims that Professor Seshan's response was inconsistent with CMU's policy. (PCSMF ¶ 217.) However, CMU points out that the decision to grant or deny the request for an incomplete was within Professor Seshan's discretion (Def.'s Resp. PCSMF ¶ 217).

take a make-up exam. (*Id.* ¶¶ 133, 136.) His request was denied, and Jain elected not to attend his final exam. (*Id.* ¶¶ 137-38.)

After failing both final exams, Jain asked Professor Sakr to intervene and allow him to drop both courses retroactively. (*Id.* ¶ 140.) CMU allows students retroactively to drop courses only when extenuating circumstances prohibit them from finishing the course work for the class or negatively affect their performance. The extenuating circumstances must be unknown and/or unanticipated during the semester and must be supported by documentation. (*Id.* ¶¶ 141-43.) As this decision is within the discretion of the department, Jain needed approval from the Director of the MCDS Program, Eric Nyberg ("Nyberg"). (PCSMF ¶ 231.) Jain met with Nyberg, who declined Jain's request to grant incomplete grades or allow him retroactively to drop his courses. (DCSMF ¶¶ 144-46.)

During his meeting with Nyberg on December 18, 2017, Jain stated that he had hypersomnia. (*Id.* ¶ 147.) According to Jain, this condition was diagnosed in May 2017 when he was at the University of Wisconsin-Madison but he had not reported it to CMU. (*Id.* ¶148.) Nyberg asked Jain to provide medical documentation of this condition. (*Id.* ¶149.) On December 20, 2017, Jain provided a one-sentence letter from Dr. Steven Fox at UPMC, which stated: "Sanchit should be permitted to have a reduced course load, due to medical concerns." The letter did not identify a specific medical condition and or reference Jain's request retroactively to drop his courses in the fall 2017 semester. Jain never provided this letter to the Office of Disability Resources. (*Id.* ¶¶ 147-51.)

MCDS Program students must maintain a 3.0 overall average each semester to remain in good standing and they must receive a B- or better in all core courses. (*Id.* ¶ 157.) At the end of the fall 2017 semester, Jain's semester QPA was a 0.89 and his overall QPA was 1.33. (*Id.*

¶¶ 154, 156.) Jain admits this is accurate although he now denies any individual responsibility for his QPA or failing grades. (*Id.* ¶ 158.) Rather, he asserts that his failure was "engineered" by CMU. (*Id.*)

The MCDS Program conducts an academic progress review at the end of each semester to "monitor individual student progress towards graduation regarding the fulfillment of curricular requirements, course grades, and academic integrity." (*Id.* ¶ 159.) If the MCDS Program Committee during its review that "a student's effort [fell] below the acceptable level of academic performance and/or fail[ed] to meet standards or policies established by Carnegie Mellon University, the student may be dismissed from the program." (*Id.* ¶ 160.) The MCDS Program also issues warnings to students if: (1) the student's overall QPA is below 3.0; (2) the student's semester QPA is below 3.0; (3) the student received a grade below a B- in a core course; or (4) the student has committed an Academic Integrity Violation. (*Id.* ¶ 162.) It may dismiss a student "if a student has received a total of at least three warnings of any type in evaluation letters from the MCDS program." (*Id.* ¶ 163.)

The MCDS Program Committee met on December 21, 2017 to discuss Jain's academic progress. (*Id.* ¶ 164.) During this meeting, Jain received three warnings: for his overall QPA falling below 3.0, his semester QPA falling below 3.0 and a failing grade in a core course. (*Id.* ¶ 166.) The MCDS Program Committee also noted that Jain received a failing grade in another course that would be a core course for the next year. (*Id.* ¶ 167.) The Committee also considered an email Jain had written to Nyberg in which he acknowledged that a "large of my predicament is because of my own actions." Jain admitted that he "should have moved to a Reduced Course Load as soon as I started having trouble. But I got used to the extensions." (*Id.* ¶ 168.)[5] As a

---

[5] Nyberg declined Jain's request to send emails to the members of the MCDS Program

8

result of its review of Jain's performance, the MCDS Program Committee dismissed him, effective immediately. (*Id.* ¶ 170.) CMU notified him in a letter dated January 4, 2018 that he was dismissed from the MCDS Program and informed him of his right to appeal the decision to the Dean of Computer Science. (*Id.* ¶ 171.) *See* PCSMF ¶ 234.

Jain's appeal to the Dean of the School of Computer Science was denied. (*Id.* ¶ 172, 174.) He then appealed to the University Provost, who also denied Jain's appeal and upheld the decision. (*Id.* ¶¶ 176, 178.) As a result, his dismissal from the MCDS Program became final as of March 8, 2018. (*Id.* ¶ 181.) *See* PCSMF ¶ 235.

Jain also filed an external complaint with the U.S. Department of Education. (DCSMF ¶ 182.) The Department of Education conducted a thorough investigation and found insufficient evidence of discrimination. (*Id.* ¶ 183.) Following Jain's dismissal from CMU, he returned to the University of Wisconsin-Madison. (*Id.* ¶ 186.)

## II. Discussion

### A. Standard of Review

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence which demonstrates the

---

Committee, but told Jain that he could send an email Nyberg and Nyberg would read the email to the others at the meeting as long as it was a positive, forward-looking plan and not more explanation about the past. (PCSMF ¶ 232.)

absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Ctr., Pa.,* 242 F.3d 437, 446 (3d Cir. 2001).

B.  Plaintiff's Disability Claims under the RA and Title III of the ADA

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 U.S.C. § 794(a).

Title III of the Americans with Disabilities Act provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who own, leases (or leases to), or operates a place of public

accommodation." 42 U.S.C. § 12182(a). "Public accommodation" includes an "undergraduate, or postgraduate private school, or other place of education." 42 U.S.C. § 12181(7)(J). "A school may not discriminate on the basis of a student's disability nor deny a reasonable accommodation to a disabled student." *Regents of Mercersburg Coll. v. Republic Franklin Ins. Co.*, 458 F.3d 159, 166 (3d Cir. 2006).

The Third Circuit has held that to prove a claim under either of these statutes, a plaintiff must show that he or she is disabled, was otherwise qualified to participate, and was precluded from participating in a program or receiving a service because of their disability. *CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013).[6] The Court of Appeals noted that "the RA allows a plaintiff to recover if he or she were deprived of an opportunity to participate in a program solely on the basis of disability, while the ADA covers discrimination on the basis of disability, even if there is another cause as well." *Id.* at 235-36 (footnote omitted).

As explained by the Court of Appeals for the Eighth Circuit about the "otherwise qualified" standard:

> Title III of the ADA does not expressly articulate an "otherwise qualified" standard (in most circumstances, no qualifications are required to enjoy a public accommodation as secured by Title III). Basic qualifications come into play, however, when the context is that of post-secondary education. In this context, the "otherwise qualified" idea is implicit in Title III's acknowledgment ... that requested modifications need not be provided if they will fundamentally alter the nature of the program. *See* 42 U.S.C. § 12182(b)(2)(A)(ii). It is beyond question that it would fundamentally alter the nature of a graduate program to require the admission of a disabled student who cannot, with reasonable accommodations, otherwise meet the academic standards of the program. An educational institution is not required by the Rehabilitation Act or the ADA to lower its academic standards for a professional degree.

*Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006) (footnote omitted). *See also*

---

[6] *CG* (like all the other cases cited by the parties) is a case decided under ADA Title II, which prohibits disability discrimination by "public entities." As explained in the Third Circuit's opinion, the same standards have been applied in cases involving Title III of the ADA.

*Bowers v. National Collegiate Athletic Ass'n*, 118 F. Supp. 2d 494, 517 (D.N.J. 2000) (the "inquiry under Title III as to whether an individual was 'discriminated against on the basis of disability' is analogous to the 'otherwise qualified' and 'by reason of' analysis that is applied to a Title II claim."); *In re Allegheny Health, Educ. & Research Found.*, 321 B.R. 776, 793 (Bankr. W.D. Pa. 2005) (Title III plaintiff must demonstrate that he is otherwise qualified for a program).

CMU concedes for purposes of this motion that Jain is disabled as defined under the relevant statutes (ECF No. 29 at 7 n.3), and courts have recognized that ADHD is a disability that these statutes address. *See C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 62 (3d Cir. 2010). It contends, however, that Jain was not "otherwise qualified" to participate in the MCDS Program and further, was not precluded from participating because of his disability.[7] Jain disputes these assertions.

CMU also argues that, even if Jain had established a "prima facie case," it has articulated a legitimate, non-discriminatory reason for dismissing him from the MCDS program and Jain has failed to proffer evidence that this reason is a pretext for unlawful disability discrimination. CMU thus invokes the familiar burden-shifting test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which was first applied in Title VII cases and later applied to cases under ADA Title I (employment discrimination based on disability). Jain also applies this standard in his brief.

---

[7] CMU also contends that Jain cannot "state a prima facie case" because he has not pointed to a comparator, citing *Xu Feng v. University of Del.*, 2018 WL 1462224, at *1 (D. Del. Mar. 23, 2018). However, the Court of Appeals later vacated the district court's decision on this very point. *Xu Feng v. University of Del.*, 785 F. App'x 53, 55 (3d Cir. Aug. 28, 2019) ("a discrimination plaintiff like Feng is not required to use [comparator evidence], or any particular method, to prove his case."). Moreover, *Xu Feng* was a case under Title VI (which follows the procedures of Title VII), not the RA or ADA Title III. As explained in the text, that standard does not apply in case.

However, the Court of Appeals has held that this test does not apply in ADA Title III cases. *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 179 (3d Cir. 2019). Rather, the standard to be applied here is the one identified above—Jain must prove that he was otherwise qualified for the MCDS Program and was precluded from participating because of his disability.[8]

    1.   Jain was not otherwise qualified.

"An otherwise qualified individual is a person who can meet all of a program's requirements in spite of a disability, with or without reasonable accommodation." *Millington v. Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 366 (3d Cir. Jan. 23, 2008) (citing *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979); *McDonald v. Pennsylvania*, 62 F.3d 92, 96 (3d Cir. 1995)). In *Millington*, the court held that the plaintiff was not otherwise qualified: she had struggled academically from the inception of her dental studies; was on and off academic probation before she requested accommodations; and her academic performance did not improve even when the school accommodated all of her requests. *See also Herrera v. Community Coll. of Allegheny Cty.*, 2017 WL 2813616, at \*5 (W.D. Pa. June 29, 2017) (student in physical therapy program failed to achieve the required score of 75% in two courses even after being provided with all requested accommodations); *Horton v. Methodist Univ. Inc.*, 2019 WL 320572 (E.D.N.C. Jan. 23, 2019), *aff'd mem.*, 788 F. App'x 209, 210 (4th Cir. Dec. 20, 2019) (student in physician assistant program argued that she was qualified because she was admitted

---

[8] An individual can also allege a failure to accommodate under Title III by showing that "(1) that the plaintiff is disabled and otherwise qualified academically, (2) that the defendant is a private entity that owns, leases or operates a place of public accommodation (for ADA purposes) …, and (3) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation." *Schneider v. Shah*, 507 F. App'x 132, 137 (3d Cir. Dec. 4, 2012) (quoting *Mershon*, 442 F.3d at 1076). "The plaintiff bears the initial burden of establishing that the desired accommodation is reasonable and necessary, while the defendant bears the burden of showing that it would fundamentally alter the nature of the program." *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 178 (3d Cir. 2019). Jain has not framed his case as a failure to accommodate case, however.

to the program, but the undisputed evidence showed that she did not meet the program's requirement for *continued* participation that she pass all but two of her classes).

Jain contends that these cases are distinguishable because in *Millington*, it was undisputed that the plaintiff was not qualified to participate in the program prior to the onset of her disability and in *Herrera*, the plaintiff did not fully use the resources available to him. However, while he contends that he was qualified based on his admission to the Program, he fails to create a genuine issue of material fact that he was qualified to *continue* participating in it.

Jain cites a regulation under the RA defining "qualified handicapped person" as "a handicapped person who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity." 34 C.F.R. § 104.3(*l*)(3). He also cites a section under the ADA that defines a "qualified individual with a disability" as:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). However, while he quotes the passage about "eligibility requirements," he omits the section of the statute that refers to "participation in programs." Indeed, neither of the provisions cited by Jain supports a conclusion that the inquiry into whether an individual is "otherwise qualified" stops at the point of admission to a program. Jain's claims are not based on his eligibility for admission to the MCDS Program—it is undisputed that he was admitted—but upon his continued participation in the Program.

Jain argues that after he was admitted to the MCDS Program, he obtained passing grades on his midterms, passed a summer course and received a B- on the one course he was able to complete in the fall of 2017, thus demonstrating that he was qualified to continue to participate

in the MCDS Program. CMU counters that these facts do not equate to a finding that he remained qualified throughout the fall term.

While Jain claims that it was "only once [CMU] engaged in discriminatory behavior" that he struggled, the uncontroverted facts of record do not support this assertion. It is undisputed that Jain received all of the accommodations he requested, including additional time on exams, additional notes/taped lectures and flexible assignments where appropriate and possible. He dropped one course within a month of the start of the semester. He did not attend classes. He requested and received multiple extensions in his courses. He received additional time to study and was given extensions on assignments after the deadlines had already passed. Even with extensions, however, he did not complete his assignments. He was counseled by his advisor, who met with him regularly. He dropped a second course in November but continued to struggle with his remaining three classes. While he received a B- in one class, he requested incompletes in his two remaining classes. Incomplete grades are left to the discretion of individual professors, and under CMU policies, are not an accommodation for a disability. He failed both classes, having elected not to take the final exam in one of the two courses. His request for retroactively dropping both classes, a decision that is within the discretion of the department, was denied as lacking extenuating circumstances and supporting documentation.

As a result, both his overall QPA and semester QPA were below the Program requirements. The MCDS Program Committee met at the conclusion of the semester to determine if his effort fell below the acceptable level of academic performance and/or failed to meet CMU's standards and policies. After this review, Jain was dismissed. Although he now contends that his failure was "engineered," Jain admitted at the time that a large part of his predicament was because of his own actions. Thus, Jain cannot reasonably argue that the

Committee dismissed him from the Program "because of his disability" given his objective failure to meet the acceptable level of academic performance and CMU's standards.

As found by a number of courts, judicial deference should be extended to decisions made by academic institutions. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision … they should show great respect for the faculty's professional judgment"). *See also Millington*, 261 F. App'x at 367; *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999); *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 153 (1st Cir. 1998) ; *Reichert v. Elizabethtown Coll.*, 2012 WL 1205158, at *13 (E.D. Pa. Apr. 10, 2012).

Jain has failed to create a genuine issue of material that he was otherwise qualified to continue participating in the MCDS Program. Although he was admitted into the Program as qualified, he struggled from the outset. It is undisputed that at the end of the fall semester, he failed to meet the minimum requirements for continuing to participate in the MCDS Program. Moreover, given the deference to which educational institutions are entitled regarding academic decisions, the Court will not re-evaluate CMU's conclusion that Jain was not otherwise qualified to continue participating in the Program.

In any event, even if Jain had created a genuine issue of material fact that demonstrated he was otherwise qualified to continue in the Program, he has not met the third prong of the test—proffering evidence that he was precluded from participating in the Program because of his disability.

### 2. Jain was not precluded from participation because of a disability.

CMU argues that Jain's contention that he was precluded from participation because of his disability is unsupported by the record. Further, it contends, the discretionary measures he

requested are not accommodations for a disability and that he has failed to point to any evidentiary support for his claim that these measures were denied because of his disability.

Jain bases his assertion that he was precluded for participating in the Program on the following: he was "discouraged" from using his approved accommodations; Professor Seshan refused to give him an incomplete in his Distributed Systems course and directly linked this decision to his previous use of accommodations; Professor Sherry refused to give him an incomplete in his Computer Systems course despite notice of his ACHD and hypersomnia; his request to take a make-up exam in his Computer Networks course was refused despite his ADHD and hypersomnia; and Nyberg refused to allow him retroactively to drop two courses.

As discussed below, Jain fails to create a genuine issue of material fact with respect to any of these contentions.

*Jain's claims of being discouraged are without merit*

Jain contends that he was "discouraged" from using his approved accommodations, citing both Getchell's comments to him and Professor Sakr's advice. As referenced above, however, Getchell granted Jain every accommodation that he requested. Thus, the fact that Getchell discussed the "potential pitfalls" of using flexible assignment completion dates because it could lead to procrastination does not explain how Getchell's advice precluded him from participating in the MCDS Program. In fact, it is undisputed that he participated in the Program and appropriately availed himself of the extensions he asked for.[9] Moreover, Jain later admitted that

---

[9] In his brief (but not his Statement of Facts), Jain states that he was allowed to use flexible assignment completion dates "only" where it was possible and appropriate (ECF No. 39 at 10). Although he contends that CMU failed to accommodate his disability by placing a discretionary aspect on his use of flexible assignment completion dates, he does not point to evidence of record that he was denied this use because of his disability. Moreover, given the deference applied to academic decisions, the Court would not second-guess CMU's decision unless it was clear that CMU had not "arrived at a rationally justified conclusion." *Reichert*, 2012 WL

the flexible assignments did lead to procrastination just as Getchell had warned.

Similarly, Jain characterizes as "discouragement" Professor Sakr's advice that he use his time to complete assignments and study for final exams rather than on drafting lengthy emails asking for extensions of time. (DCSMF ¶¶ 64, 124.) He does not explain, however, why this represented "discouragement" or how it precluded him from participating in the Program. He also contends that Professor Sakr responded to his request for retroactive course dropping by suggesting that he take a year or two off instead. He provides no support for the contention that this comment prevented him from participating in the Program given that the decision was not for Professor Sakr to make. At any rate, he ignored this advice and made the request of Nyberg, who denied it, and he has not connected the comment in any way to his disability. Jain also fails to cite any authority to support a conclusion that a student who is "discouraged" from using an accommodation but who nonetheless does so can still maintain a claim that he was "precluded from participating in a program because of a disability." Thus, Jain's argument that he was discouraged from using his accommodations are without merit.

### CMU's refusal of discretionary policies is not a basis for liability

Jain also argues that CMU improperly structured its Program in such a way that he could not meaningfully access it. "The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

In support of his position, Jain relies on *Sellers v. University of Rio Grande*, 838 F. Supp.

---

1205158, at *10. "We will not invade a university's province concerning academic matters in the absence of compelling evidence that the academic policy is a pretext for [disability] discrimination." *Mershon*, 442 F.3d at 1078 (citation omitted). Jain provides no factual support for any such conclusion.

2d 677 (S.D. Ohio 2012). In that case, the plaintiff was a nursing student who contended that the university had failed to offer her tutoring services which were offered to all students based on her disabilities, which included ADHD. The court held that "there is a substantial argument to be made that the University was required under 34 C.F.R. § 104.4(b)(ii) to provide tutoring to its disabled students to the same extent it offered such services to its general student population." *Id.* at 685.[10]

But *Sellers* differs from this case in an important respect. Jain sought discretionary measures which he contends were available to all students. But what was available to all students was the *opportunity to ask for* these measures as Jain did, not to receive them. As CMU notes and Jain admits, the discretionary measures for which Jain applied were not accommodations for his disability, but rather, were matters appropriately decided by individual professors under CMU's established policies for all students. At the end of the day, it is fully within the discretion of the professor to permit, or not to permit, a student's request. If Jain contends that he was entitled as a matter of law to receive these discretionary measures,[11] he provides no support for such a contention. In addition, "[t]he federal judiciary is ill equipped to evaluate the proper emphasis and content of a school's curriculum." *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 436 (6th Cir. 1998) (citation omitted).

Jain argues in the alternative that even if CMU was not required to provide him with the discretionary measures he requested, it could not deny his requests *because of* his disability. He

---

[10] Unlike the present matter in which the record has been fully developed, *Sellers* was decided on a motion for a temporary restraining order.

[11] See PSCMF ¶ 212 (claiming that CMU's student handbook states that "incomplete grades *are* to be granted where an instructor agrees…" but the handbook states that, "if the instructor agrees, a grade of I (incomplete) *may* be given when a student, for reasons beyond his or her control, has been unable to complete the work of a course, but he the work completed to date is of passing quality and the grade of incomplete provides no undue advantage to that student over other students." (ECF No. 31-6 at 7 (emphases added).

fails to bring forth any evidence of record that CMU did so, however.

It is undisputed that Jain requested that his professors issue incompletes, allow him to retroactively drop courses and/or permit him to take a make-up exam and further, that these requests were denied. A review of the circumstances of each of these issues compels the conclusion as a matter of law that the denial of Jain's requests was not because of his disability.

Jain requested that Professor Seshan give him an incomplete grade in his Distributed Systems course. Throughout the semester, Jain was given various authorized accommodations by Professor Seshan, including extra time on exams and permission to record lectures. (PCSMF ¶ 220.) Moreover, Professor Seshan went beyond the authorized accommodations, including allowing Jain to take the mid-term exam three days late. Professor Seshan responded that: "Unfortunately, without an explicit medical letter/request from CMU disability, we will not be able to give you an incomplete." (DCSMF ¶ 112.) The next day, Professor Seshan clarified that "it needs to be a note from the CMU administration requiring that we grant you an incomplete for the semester. A medical note saying that you were sick will not suffice for an incomplete." (*Id.* ¶ 113.)

Upon being contacted in this regard, Getchell, representing the Office of Disability Resources, advised both Jain and Professor Seshan that it was not able to recommend incomplete for students with disabilities.[12] She provided reasons for its position. Among other things, Getchell advised that granting students with disabilities an extended deadline for course completion places an undue hardship on the faculty and the university, so it is the practice not to allow this as a disability accommodation. She added that "we tell students that all of their

---

[12] Significantly, Plaintiff does not contend that Getchell's response or the position of the Office of Disability Resources regarding this issue was evidence of discrimination on the basis of his disability.

assignments are still due by the end of the semester." (*Id.* ¶ 118.)

Professor Seshan advised Jain that based upon Getchell's response, he would not be giving Jain an incomplete. When Jain asked him to reconsider, the professor noted that Jain had been provided with "numerous extensions throughout the semester for individual assignments. We cannot grant you an incomplete as well." (ECF No. 42-2 at 353.) *See* PCSMF ¶ 219.

CMU argues that Professor Seshan's comments do not connect the denial of Jain's request for an incomplete to his disability because Professor Seshan had the discretion to approve or deny such a request. Moreover, he had granted disability accommodations to Jain well beyond those that were required, thus reflecting a lack of any discriminatory animus. Since the professor was unwilling to exercise his discretion to grant an incomplete unless the Office of Disability Resources required him to do so, his ultimate decision was entirely consistent both with its recommendation as well as his previous statements and does not reflect that he did so because of Jain's disability. Therefore, Jain has failed to show the existence of a material issue of fact regarding the basis for the denial of his request for an incomplete. Simply put, Professor Seshan declined to exercise his discretion to allow an incomplete unless the Office of Disability Resources felt that it was necessary and required.

Even if Professor Seshan's comment could be construed to suggest discrimination on the basis of Jain's disability, Jain has failed to present any evidence that if he had received an incomplete in Professor Seshan's class, the ultimate outcome would have been any different. The record does not include any facts that suggest that his status would have changed or the Committee's decision would have been different. Rather, Jain contends that he was also discriminated against when he did not receive the other incomplete he requested and when his requests for a make-up exam and retroactive course dropping were denied. However, Jain has

provided no factual basis upon which a trier of fact could conclude that all of these other events were connected to his disability.

Jain suggests that he "should have" received an incomplete in his Computer Networks course, noting that he had a B+ on his midterm exam and his professor did not provide a reason for denying his request. (PCSMF ¶¶ 221-23.) The undisputed facts of record confirm that receiving an incomplete is not an accommodation; rather it is a matter within a professor's discretion. Moreover, as Getchell explained, granting students with disabilities an extended deadline for overall course completion was ill-advised. There is no evidence of record that declining his request for an incomplete was based upon his disability. In fact, when Jain requested an incomplete, his professor encouraged him to continue and told him what he needed to do to finish the course. This is hardly illustrative of an intent to discriminate.

The same analysis applies to his request for a make-up exam. He was not "entitled" to a make-up exam; it was not an accommodation and the decision was a matter for the professor's discretion. (PCSMF ¶ 226.) Jain made his request half an hour before the final exam was scheduled to begin, was "totally capable of coming to campus, but I think I'll definitely flunk the exam in this condition," and was informed that no make-up exam was planned for this test. (DCSMF ¶¶ 135-37.) He chose not to take the exam. Again, Jain fails to create an issue of fact regarding his contention that his request was denied because of his disability. The only evidence of record is that his professor exercised the discretion permitted by CMU's policies in denying Jain any opportunity to take a make-up exam.

In short, rather than proffer any factual support for his claims, Jain relies solely on conjecture and speculation to suggest that his requests for incompletes and a make-up exam were denied because of his disability. As such, he fails to meet his burden of coming forward with

evidence of record that supports his claims or creates a genuine issue of material fact.

With respect to his request to retroactively drop the two courses he failed, Jain contends that he requested permission from his advisor, Professor Sakr, who denied his request and suggested that Jain take a leave of absence. (PCSMF ¶¶ 227, 229). However, it is uncontroverted that Jain's request had to be approved by Nyberg, the head of the department. (PCSMF ¶ 228; DCSMF ¶ 141.) As Jain acknowledges, this remedy is allowed only when extenuating circumstances which were previously unknown and/or unanticipated during the semester arise and are supported by documentation. (DCSMF ¶¶ 142-43.)

During his meeting with Nyberg, Jain stated that he had hypersomnia.[13] However, at no point during the semester had Jain presented his hypersomnia as a disability to the Office of Disability Resources or requested any accommodation for it (DCSMF ¶¶ 130-31).[14] Jain states that he also experienced increasing symptoms of anxiety and depression during the fall 2017 semester and was later diagnosed with both anxiety and depression in June 2018 at the UW Health Center. (PCSMF ¶ 196.) CMU disputes that the records cited by Jain support the claim that he experienced increasing symptoms of anxiety and depression during the fall 2017 semester, but rather, that he was diagnosed with anxiety and depression after he left CMU. (ECF

---

[13] The parties dispute certain details about the diagnosis and treatment of this condition. Jain states that he was not formally diagnosed with chronic hypersomnia until March 2018 (PCSMF ¶ 195). CMU notes that medical records from UW Health dated June and July 2018 (ECF No. 42-1 at 17-33) reflect that he first sought treatment for hypersomnia in July 2017 and was formally diagnosed with hypersomnia by UW Health on August 27, 2017 (*Id.* at 10-16), before he matriculated at CMU. After the meeting between Jain and Nyberg, Jain provided a December 20, 2017 one-sentence letter from a physician which stated only that Jain should have a reduced course load due to "medical concerns."

[14] Plaintiff states that, during the appeal process, he tried to obtain medical information to support his hypersomnia and anxiety (PCSMF ¶ 236) but does not indicate that he submitted any supporting documentation. Even if he did, however, this would not show that CMU precluded him from participating in the Program because of these conditions since the decision to dismiss him from the Program had already been made.

No. 42-1 at 17-33.)

Jain considered his symptoms of hypersomnia and anxiety a chronic health condition, not a disability, and was unaware that he could obtain additional accommodations to help him access his educational program bases on these issues. (PCSMF ¶ 197, 198.) CMU does not dispute that this was Jain's subjective belief but asserts that his belief does not create a genuine issue of fact and is not material to its motion for summary judgment. The Court agrees. In order to be held liable for precluding him for participating in the Program because of these conditions, CMU "must know or be reasonably expected to know" of Jain's hypersomnia and anxiety. *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1381 (3d Cir. 1991). *See Shamonsky v. Saint Luke's Sch. of Nursing,* 2008 WL 724615, at *3 (E.D. Pa. Mar. 17, 2008); *Frilando v. Bordentown Driver Training Sch., LLC*, 2017 WL 3191512, at *10 (D.N.J. July 27, 2017). Jain did not reveal these conditions or request an accommodation for them. The reason he did not do so is not material to the issues raised in CMU's motion for summary judgment. As a result, he cannot rely on his hypersomnia, anxiety or depression as a basis for a claim that CMU refused to provide accommodations for these conditions.

Simply put, Jain has failed to create any issues of material fact that would support his claim that CMU declined to give him incompletes, allow a make-up exam or agree to let him retroactively drop the classes that he failed because of his disability.

For the reasons explained above, Jain has not established that he was otherwise qualified to continue participating in the MCDS Program. Moreover, a finder of fact could not reasonably find that he was dismissed from the MCDS Program solely based on his disability, as required for his RA claim, or that his disability was a motivating cause of his dismissal, as required for his ADA Title III claim.

## III. **Conclusion**

For all of these reasons cited above, the motion for summary judgment of Defendant Carnegie Mellon University will be granted. An appropriate order follows.

BY THE COURT:

PATRICIA L. DODGE
United States Magistrate Judge